FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KENNETH L. BERGER       :        CIVIL ACTION
                         :
        v.         :
                         :
THE PRUDENTIAL INSURANCE  :
COMPANY OF AMERICA      :        NO. 04-5205

MEMORANDUM AND ORDER

McLaughlin, J.                       February 7, 2006

Kenneth Berger appeals the decision of The Prudential Insurance Company of America ("Prudential") to deny him disability benefits under a plan regulated by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. Prudential's denial was based upon its decision that Berger was no longer disabled within the meaning of the plan.

Berger had spinal disc problems. He received benefits from Prudential in 2000 and 2001, and underwent two spinal fusion surgeries during that time. Six months after the second surgery, Prudential terminated his receipt of benefits. Berger appealed this decision three times, and Prudential upheld its denial each time. Having exhausted his administrative remedies, Berger appealed Prudential's decision in state court, and Prudential removed to this Court. The Court decides here the parties' cross-motions for summary judgment.

The Court will grant Prudential's motion for summary judgment and deny Berger's motion for summary judgment. The

Court concludes that there is no genuine dispute of material fact, and that Prudential's decision should be upheld under a slightly heightened arbitrary and capricious standard of review.

I.   Facts

    A.   Parties

Berger was born on January 20, 1976.  He worked for Answer Think Consulting Group, Inc. ("Answer Think") as a computer consultant from July of 1998 until June of 2000, when he first went on disability.  His occupation was sedentary – he spent most of his time sitting down.  Prudential provided disability insurance to Berger through its contract with Answer Think.  (Berger Mot. Summ. J. 1; Prudential Resp. 1).

    B.   Berger's Medical History

Dr. Mitchell K. Freedman's report of February 18, 2000, indicates that Berger had had back pain since September of 1998, when he was lifting weights and felt like his muscles slipped. In September of 1999, Berger developed pain in his left buttock, and the pain flared up when he was shoveling several weeks before his appointment with Dr. Freedman.  The pain was worse with sitting or bending and best when he changed position. (Administrative R. ("Pru") 237-38).

Dr. Freedman's report of June 2, 2000, indicates that

Berger still had severe pain in his back, calf, and foot, which worsened with sitting and improved with rest. An MRI of Berger's lumbar spine showed evidence of radial lucency in the L4 and L5 pedicles, a high intensity zone lesion at L5-S1, a small central herniated disc at that level, and bulging at L4-5. Dr. Freedman believed that Berger was most symptomatic related to his discogenic changes, and noticed some radiculitis, or swelling. (Pru 239).

The July 3, 2000, report of Todd J. Albert, M.D., indicates that Berger was lifting weights over a year prior to the report when he developed severe left-sided low back pain and leg pain. Dr. Albert evaluated Berger's X-rays and CT scans and determined that he had an unhealed left-sided pedicle fracture and right-sided spondylotic defect. (Pru 240).

Berger underwent posterior lumbar fusion surgery in his L4-5 disc space on July 12, 2000. Dr. Albert's reports from the time between Berger's first and second surgeries indicate that Berger did not feel improvement, and that although some problems had been corrected, Berger had significant degeneration at L4-5 in the disc space. On May 2, 2001, Berger underwent a second surgery, a two level fusion revision. Dr. Albert predicted that he would be "out of work for approximately six months after the [second] surgery." (Pru 200, 233, 242-46; Berger Mot. Summ. J. 4).

Dr. Albert's nurse's report of June 18, 2001, indicates that Berger was neurologically intact, that the X-rays revealed that the posterior instrumentation and interbody cage were excellent, and that the patient still experienced "residual left leg pain," but was otherwise "doing well."  (Pru 248).

Dr. Albert's report of August 6, 2001, three months after the second surgery, indicates that Berger was feeling better, but continued to have left leg sciatica which was worse when he sat and somewhat improved when he stood.  The report indicates that he had no tension signs and full strength throughout his lower extremities.  (Pru 266).

Dr. Albert's nurse's report of October 30, 2001, six months after the second surgery, indicates that Berger had improved, that he experienced sciatic pain after rigorous exercise at the gym, but that more aggressive exercise had caused improvement over the last few weeks.  The report indicates that Berger was "neurologically intact" and that "X-rays reveal[ed] excellent positioning of the instrumentation and placement of the interbody cage."  On October 30, 2001, Dr. Albert wrote a letter indicating that Berger was not able to return to work at that time "due to physical restrictions."  (Pru 236, 264).

Dr. Albert's report of January 8, 2002, eight months after the second surgery, indicates that Berger continued to have daily sciatic pain, and reiterates the other findings of the

4

October 30, 2001 report.  It indicates that Dr. Albert felt that the patient was unable to return to work due to the sciatic pain. (Pru 252)._____

_____Dr. Albert's letter of January 17, 2002, indicates that Berger had "currently intractable back and leg pain," and was "disabled due to this pain" because it did "not allow him to sit or stand for any prolonged period of time without exacerbating his symptoms."  The letter indicates that "the patient would have no specific restrictions if he had been in little to no pain." (Pru 221).

_____Dr. Albert's nurse's progress note of May 13, 2002 indicates that Berger continued to do incrementally better, that he still experienced a lot of leg pain with activity, but that he felt that the pain was slowly improving.  The report indicates that Dr. Albert felt that Berger should continue with his activities as tolerated and come back in a year.  (Pru 138).

Dr. Albert indicates in a progress note of November 19, 2002, that Berger's pain became worse in August, but then improved.  It indicates that the wound was well-healed, the patient was neurologically intact, and his motor strength was full.  Dr. Albert recommended full activities.  (Pru 137).

_____Dr. Albert's letter of January 16, 2003, indicates that Berger still had back pain and bilateral leg pain, which became intolerable with sitting, precluded him from employment, and

rendered him disabled.  (Pru 151).

_____   C.   Initial Disability Determinations

_____       Under Prudential's plan, an employee is disabled when
Prudential determines that he is "unable to perform the material
and substantial duties of [his] regular occupation due to
sickness or injury."  Material and substantial duties are those
"normally required for the performance of [an employee's] regular
occupation" which "cannot be reasonably omitted or modified."
(Pru 22).

       Berger first applied for and received short-term
disability ("ST") benefits in June of 2000.  On August 28, 2000,
Prudential determined that Berger was totally disabled and
approved long-term disability ("LT") benefits for him, effective
August 30, 2000.  These benefits continued throughout 2000 and
into 2001.  (Pru 267, 271).

       In the SOAP Note of May 24, 2001, Prudential claim
manager Jacqueline Ganguzza noted that Berger's attending
physician, Dr. Albert, assessed six months for full recovery.
Thus, she found that he would be recovered and able to perform
his job by November 16, 2001, and recommended that his last day
of benefits should be November 15, 2001.  Prudential accepted its
employee's recommendation, and notified Berger on October 18,
2001, that his benefits would be terminated as of November 15,

2001.  (Pru 62, 114-15).


        D.   First Request for Reconsideration

            Berger requested reconsideration of Prudential's
decision on November 30, 2001. (Pru 183).

            Prudential reviewed the information submitted by
Berger, as well as the information already contained in his file.
Its noted that X-rays and tests showed that Berger's surgery was
successful.  It considered his statements that he had improved.
It noted his ability to perform rigorous exercise at the gym.
(Pru 108).

        Based upon these considerations, Prudential concluded
that Berger had the ability to perform the material and
substantial duties of his sedentary occupation.  It upheld its
decision to terminate Berger's benefits as of November 15, 2001
on December 20, 2001.  (Pru 108-110).


        E.   Second Request for Reconsideration

        Berger requested a second reconsideration of the
decision on January 18, 2002. (Pru 179).

            As part of the second reconsideration, Prudential
requested that Paul L. Liebert, M.D., an orthopedic surgeon,
perform an independent medical examination ("IME") of Berger.
This IME took place on March 26, 2002.  On April 17, 2002, Dr.

7

Liebert sent Prudential a report based upon this IME.   (Pru 167).

In the report, Dr. Liebert detailed Berger's medical history, including his visits to a chiropractor, Dr. Freedman, Dr. Albert, and a Dr. Valentino, his first surgery, his physical therapy, the MRI and discogram that led to his second surgery, his doctor visits after the second surgery, and his reports of continuing sciatic discomfort and continuing partial back pain. He noted that Berger was not currently undergoing physical therapy but was exercising at home and going for regular walks. He noted that he used no assistive aids.  Dr. Liebert provided a detailed, seven page report that analyzed Berger's pain profile and medical documentation.  He detailed the findings of his physical examination and made an assessment based upon them. (Pru 167-73).

He found that although Berger exhibited signs of low back pain, he exhibited no signs of sciatic leg pain, of which he chiefly complained.  He found that there were no signs of impingement or sciatica on provocative testing, no atrophy to suggest disuse, and remarkably well-preserved leg musculature. He found mild and localized decreased sensation on the bottom of Berger's feet.  He opined that the lower extremity pain was poorly corroborated by objective physical examination or electrodiagnostic findings.  (Pru 167-73).

Prudential's phone records show that Dr. Liebert

suggested that Dr. Albert had said that Berger either had a psychological condition or was faking his pain.  Dr. Liebert inquired as to whether Prudential had considered surveillance of Berger.  Prudential responded that it could be considered, but it never occurred.  (Pru 81).

In addition to reiterating its reasons for its prior determination that Berger was no longer disabled, Prudential considered Dr. Liebert's report.  Based upon this information, Prudential determined that Berger could perform his job as long as he could change positions.  Thus, it upheld its denial of further benefits once again on April 24, 2002.  (Pru 100-102).

F.  <u>Third Request for Reconsideration</u>

Berger requested a third reconsideration of the denial on January 16, 2003.  (Pru 150).

As part of the third reconsideration, Prudential asked Gale G. Brown, Jr., M.D., who is qualified in physical medicine and rehabilitation, to conduct a medical file review for Berger. Dr. Brown reviewed the records of Drs. Freedman, Albert and Liebert for the purpose of commenting on any medically determinable impairment that would significantly restrict Berger's ability to perform the essential duties of his sedentary occupation.  (Pru 129).

Dr. Brown chronicled Berger's doctor visits, surgeries,

9

treatment and symptoms.  The report concluded that the evidence supported a finding of "mild musculoskeletal impairment" related to Berger's low back pain, but that there "[wa]s no medical evidence supporting neurological impairment or spinal instability."  The finding was based on the facts that Drs. Albert and Liebert documented normal postoperative neurological exams and X-rays.  Dr. Brown noted that Dr. Albert specifically noted that Berger's fusion was solid during his November 19, 2002 office visit.  Dr. Brown noted that Dr. Albert documented no specific musculoskeletal abnormalities after the surgery, and that Dr. Liebert, the IME orthopedist, noted mild impairments consistent with mechanical low back pain.  (Pru 129-34).

Dr. Brown found that restrictions including hourly position changes, occasional bending and twisting at the waist, and no heavy lifting were necessary for Berger.  Dr. Brown noted that with these restrictions, Berger could perform his sedentary occupation.  (Pru 129-34).

To further support this conclusion, Dr. Brown noted that Berger admitted that he can sit or stand for up to an hour. She noted that his reported inability to work due to severe and disabling pain is inconsistent with the facts that he takes no medications, does no active physical therapy, and only occasionally sees his physician.  (Pru 129-34).

Dr. Brown also noted that Dr. Albert's opinions contain

contradictions.  For example, on November 19, 2002, he recommended full activities with no specific restrictions.  Two months later, on January 16, 2003, he reported that the claimant could not work due to reported severe pain and disability, but offered no medical evidence to support this opinion, instead documenting normal neurological exams, no musculoskeletal findings, and a solid fusion without complication.  Dr. Brown also noted that Berger acknowledged his ability to perform rigorous workouts.  She noted that his "mild abnormal posturing and splinting behavior during examination . . . suggest inappropriate illness behavior."  (Pru 129-34).

Prudential described Dr. Freedman's, Dr. Albert's, Dr. Liebert's and Dr. Brown's findings in its final denial of benefits on April 30, 2003.  It concluded that Berger had mild musculoskeletal impairment, and that he could perform his job with the restrictions discussed in Dr. Brown's report.  (Pru 91-93).

G.   <u>Prudential's Contact with Berger's Doctors</u>

Prudential contacted and attempted to contact Berger's doctors on multiple occasions throughout this process.  Prudential requested records from Dr. Freedman on January 30, 2001, and March 23 and 26, 2001.  Prudential attempted to contact Dr. Albert on December 13 and 21, 2000.  Prudential contacted Dr.

Albert in correspondence dated June 19, 2002 and August 5, 2002 to obtain Berger's medical records from him.  On February 12, 2003, Prudential requested medical records from Dr. Albert.  On February 13, March 7, and April 17 and 23, 2003, Prudential communicated with Dr. Albert's office again.  Dr. Albert did not return the calls.  (Pru 72-75, 82-83, 97-98, 135, 204).

II.  Procedural History

        Berger filed a complaint in the Court of Common Pleas of Delaware County, Pennsylvania on September 22, 2004.  Prudential filed a notice of removal in this court on November 8, 2004.  Both parties filed motions for summary judgment on August 15, 2005.[1]

III. Standard of Review

        The denial of ERISA benefits is reviewed under a de novo standard, unless the benefit plan gives the administrator or fiduciary the discretion to determine eligibility or construe the plan terms, in which case an arbitrary and capricious standard applies.  Stratton v. E.I. Dupont De Nemours & Co., 363 F.3d 250, 253-54 (3d Cir. 2004).  The arbitrary and capricious standard

---

        [1] Under Fed. R. Civ. P. 56, summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

requires a court to defer to the plan administrator unless its decision is "clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." <u>Abnathya v. Hoffmann La Roche Inc.</u>, 2 F.3d 40, 41 (3d Cir. 1993).

In cases that would normally fall in the arbitrary and capricious category, but in which the insurance company both determines benefit eligibility and pays those benefits out of its own funds, the United States Court of Appeals for the Third Circuit has held that a less deferential, heightened arbitrary and capricious standard applies. <u>Pinto v. Reliance Standard Life Ins. Co.</u>, 214 F.3d 377, 378 (3d Cir. 2000). The rationale for this heightened level of scrutiny is that in these cases, "insurance carriers have an active incentive to deny close claims in order to keep costs down and keep themselves competitive so that companies will choose to use them as their insurers." <u>Id.</u> at 388.

In this case, the parties agree that Prudential retained the discretion to determine eligibility and construe terms, and it paid out the benefits. Thus, under <u>Pinto</u>, the heightened arbitrary and capricious standard applies. The <u>Pinto</u> court held that this heightened standard should be applied through a sliding scale approach, under which the degree of scrutiny intensifies to match the degree of conflict. <u>Id.</u> at

379.  Under this approach, courts examine the facts of each case and may consider procedural irregularities.  Id. at 393.

There are several relevant procedural considerations under this standard.  If an insurance company treats the same facts inconsistently, its decision may be viewed with suspicion. Id. at 394.  The same is true if it considers some facts presented to it, and ignores others that support a claimant's position.  Id.  Courts also consider whether insurance companies follow the recommendations of their own employees in making benefits decisions.  Id.

Unlike in Pinto, Prudential's decision to cut off Berger's benefits was not based upon inconsistent treatment of the same facts.  Rather, Prudential considered new information at each step of the appeals process.  When Berger first received benefits, he had a left-sided pedicle fracture, a right-sided spondylotic defect, a herniated disc, and back and leg pain.  At the point at which his benefits were cut off, Prudential had information from several doctors indicating that Berger was neurologically intact, and ready to resume full activities. Thus, Prudential's initial decision to provide benefits and its later decisions to deny benefits were based upon the improvement in Berger's condition after surgery.

Berger argues that Prudential considered some statements in Dr. Albert's reports, and ignored others.  The

14

Court finds that Prudential considered all of the medical records before it, and reached a different conclusion than Dr. Albert, based in part upon the opinions of Drs. Liebert and Brown.  The reports of Drs. Liebert and Brown discussed the records of Drs. Freedman and Albert in detail, noting those doctors' comments on both how Berger had improved and how he had not.  Prudential contacted Berger's doctors several times to request more information.  Berger's argument that Prudential's disagreement with Dr. Albert's conclusion constitutes selective consideration of information is without merit.

Unlike the defendant in <u>Pinto</u>, Prudential followed the advice of its own employee, Ms. Ganguzza, who recommended that benefits be terminated.  Ms. Ganguzza based her initial decision upon the estimated recovery time for Berger provided by Dr. Albert.

In addition to procedural irregularities, courts calibrate the heightened arbitrary and capricious standard of review based upon factors such as "the sophistication of the parties, the information accessible to the parties, and the exact financial arrangement between the insurer and the company."  <u>Id.</u> at 392.  Courts may also consider the current status of the fiduciary employer because, for example, an employer on the brink of dissolving has a diminished incentive to maintain employee satisfaction.  <u>Id.</u>

15

As to the first factor, sophistication of the parties, it is proper to "assume there was a sophistication imbalance between the parties," because "[t]here is no reason why [Berger] would have had ERISA or claims experience, whereas [Prudential], a large, successful company with many employees, had numerous such claims." Stratton, 363 F.3d at 254.  It appears that Prudential educated Berger as to his options at every stage of the appeals process, so as to minimize the importance of this gap.  Nevertheless, the first factor weighs in favor of heightening the standard.

Berger makes no arguments for a heightened standard based upon a lack of access to information, or the finances or status of Prudential or Answer Think.  These factors do not affect the arbitrary and capricious standard.

Thus, the appropriate standard appears to be one of slightly heightened arbitrary and capricious review.  In this situation, it is appropriate for the Court to "apply the arbitrary and capricious standard, and integrate conflicts as factors in applying that standard, approximately calibrating the intensity of [the] review to the intensity of the conflict."  Id. at 255.

IV. Analysis

The Court must consider whether there are any genuine

16

issues of material fact indicating that Prudential acted arbitrarily and capriciously under the slightly heightened standard when it ultimately concluded that Berger was not totally disabled and therefore, was not entitled to LT benefits beyond November 15, 2001.  Berger argues that Prudential's decision was arbitrary and capricious because it was based upon a non-examining physician's records review and a biased examining physician.  He also argues that a finding that complaints of pain are solely subjective does not justify a denial of benefits. Prudential argues that its decision should be upheld, as there is no evidence of procedural irregularities or bias, and its denial was appropriate based upon the record before it.

        The Court must consider the evidence that an insurance company considered to determine whether its decision was arbitrary and capricious.  See, e.g., Stratton, 363 F.3d at 257-58 (applying the Pinto standard and holding that an insurance company had properly denied benefits to an employee where it had invited information from treating physicians, reviewed medical reports, had its own physicians review the information, and ultimately disagreed with the claimant's treating physicians); Abnathya, 2 F.3d at 42, 48 (upholding an insurance company's denial of benefits to a claimant in a sedentary occupation where it had based its decision upon two independent medical evaluations concluding that the claimant was not totally disabled

17

despite her complaints that sitting for long periods of time caused her pain in her neck, shoulders, and extremities, and her claim that she was totally disabled).

It is important to examine whether an insurance company considers additional information and medical history from a claimant's previous treating physicians in making its decision. Stratton, 363 F.3d at 257.  In addition, the number, credibility, expertise, and familiarity with the claimant of the doctors upon which an insurance company bases its decision are relevant. Pinto, 214 F.3d at 394.

Although an insurance company may not arbitrarily refuse to credit the opinions of a claimant's treating physicians, it is not required to accord special weight to those opinions in the face of contrary evidence.  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  As the United States Supreme Court has noted, "if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'"  Id. at 832.

It can be arbitrary and capricious to require etiological evidence of the cause of a condition in order for a claimant to be entitled to benefits, though this is not true in every case.  Mitchell v. Eastman Kodak Co., 113 F.3d 433, 443 (3d Cir. 1997).  In Mitchell, such a requirement was held to be

arbitrary and capricious because the plan under which the
claimant claimed benefits did not require etiological proof under
the definition of "disabled," the medical and legal communities
recognized that there was no objective test for the ailment of
which the claimant complained, and it was undisputed that
restricting activities was the only way to prevent exacerbation
of the claimant's condition.  Id.  The Mitchell court noted that
"in some contexts it may not be arbitrary and capricious to
require clinical evidence of the etiology of allegedly disabling
symptoms in order to verify that there is no malingering."  Id.
at 442-43.

        This case is analogous to Stratton and Abnathya.  As in
Stratton, Prudential ultimately based its decision upon the
opinions of independent physicians, one of whom examined Berger
and both of whom considered his medical records.  These
physicians were qualified in the relevant fields of orthopedic
surgery and physical medicine and rehabilitation.  They examined
Berger's medical history, giving due weight to Dr. Albert's
findings, and drew their own conclusions.

        As in Abnathya, Prudential's own experts concluded that
although Berger still experienced some pain, the conclusion that
this pain was disabling and prevented him from working was not
corroborated by the clinical and diagnostic evidence.  Dr. Brown
noted that Berger takes no medication, does no formal physical

therapy, and is capable of working out and driving.  Drs. Liebert and Brown noted that the testing performed on Berger did not comport with his complaints of severe pain.[2]  Prudential decided to credit these conclusions over Dr. Albert's conclusions.

As courts have repeatedly held, Prudential was not required to accord special weight to Dr. Albert's findings.  Dr. Albert spent more time with Berger, and his opinion deserves weight in this regard.  However, he made inconsistent reports, first concluding that Berger could engage in full activities and noting that he could perform vigorous exercises at the gym, and then claiming that he was completely disabled and unable to work without providing any new information.  Prudential was entitled to credit the conclusions of Drs. Liebert and Brown over those of Dr. Albert.

This case is distinguishable from <u>Mitchell</u>.  Although in both cases the plans did not require etiological evidence of a disability, in <u>Mitchell</u>, there was no medical test which could possibly provide such evidence.  In contrast, in this case, the medical tests before Berger's surgery showed that he had visible problems.  After his second surgery, the tests showed that these

---

[2] Contrary to what Berger argues, Dr. Liebert's suggestions that Berger might have been exaggerating his injuries do not show that the doctor was biased against him.  Having seen that Berger's tests showed a lack of neurological problems and that his actions showed at most slight pain, Dr. Liebert concluded that his claims of severe pain may have been exaggerated.

problems had been solved.

Another difference between the cases relates to the curability and improvement of the claimants' medical conditions. In Mitchell, limiting activities was the only cure for the ailment at issue.  Here, in contrast, surgery could be done, was done, and was undisputably successful at fixing the pedicle fracture and other visible problems that Berger's earlier tests had revealed.  Also, in Mitchell, the claimant could only find relief by restricting activities, but here even Berger's own doctor agreed that his pain was lessened when he changed position.  (Pru 197, 266).  Even though Berger's sedentary job involved primarily sitting, he could be accommodated by stretching and getting up from his seat at work, as Drs. Liebert and Brown noted.  An employee who can perform his job with minimal accommodation is not disabled.

The Court finds that Prudential did not act arbitrarily and capriciously in terminating Berger's benefits in view of its thorough examinations of the evidence before it on multiple occasions, the agreed-upon lack of any etiological evidence of disability, and the observational and anecdotal evidence indicating that Berger can perform many daily tasks, takes no medication, does no formal therapy, and infrequently visits his doctor.

An Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KENNETH L. BERGER          :          CIVIL ACTION
                           :
              v.           :
                           :
THE PRUDENTIAL INSURANCE       :
COMPANY OF AMERICA         :          NO. 04-5205

<u>ORDER</u>

AND NOW, this 7th day of February, 2006, upon
consideration of the motions for summary judgment of both parties
(Docket Nos. 10 and 11), and all responses and replies thereto,
and after a hearing on October 27, 2005, IT IS HEREBY ORDERED
that, for the reasons set forth in a memorandum of today's date,
the defendant's motion for summary judgment is GRANTED and the
plaintiff's motion for summary judgment is DENIED.  Judgment is
entered in favor of the defendant and against the plaintiff.
This case is closed.


BY THE COURT:


<u>/s/ Mary A. McLaughlin</u>
MARY A. McLAUGHLIN, J.